UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

JAMES D. HARMON, JR. and JEANNE HARMON,

                Plaintiffs,

             - against -

MARVIN MARKUS, individually and in his official
capacity as MEMBER AND CHAIR OF THE NEW
YORK CITY RENT GUIDELINES BOARD, CITY
OF NEW YORK; DEBORAH VAN AMERONGEN,
individually and in her official capacity as
COMMISSIONER, DIVISION OF HOUSING &
COMMUNITY RENEWAL, STATE OF NEW YORK,

                Defendants.

--------------------------------------------------------------------x

**08 CIV 5511**

08 Civ.

**COMPLAINT**

JUN 18 2008

Plaintiffs James D. Harmon, Jr. and Jeanne Harmon by their attorney James D. Harmon, Jr., as and

for their Complaint in this action, allege as follows

### Jurisdiction

1.    This court has jurisdiction pursuant 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 28 U.S.C. §

    1343.

### Venue

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part

    of the events giving rise to the claims alleged herein have occurred, and will continue to

    occur, in this district, and because the property which is the subject of this action is located

    in this district.

### Nature of the Action

3.    This is an action pursuant to 42 U.S.C. § 1983, and the inherent authority of federal courts

to protect rights safeguarded by the Constitution, for a declaratory judgment that Chapter 4 of Title 26 of the New York City Administrative Code ("Administrative Code") pertaining to rent stabilization, and the regulations implementing and administering the Administrative Code, 19 NYCRR Parts 2520-2530 (the "Rent Stabilization Code"), have deprived, do deprive, and will continue to deprive, plaintiffs of rights guaranteed by the Constitution of the United States. (The "Administrative Code" and the "Rent Stabilization Code" are both collectively referred to herein as "the Rent Stabilization Law").

4.      In particular, the Rent Stabilization Law is unconstitutional as applied to plaintiffs because it violates and deprives them of their rights under:

a.      the Takings Clause of the Fifth Amendment of the Constitution;

b.       the Due Process Clause of the Fourteenth Amendment to the Constitution;

c.      the Contract Clause of Article I §10 of the Constitution;

d.      the Thirteenth Amendment to the Constitution; and

e.      the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

5.      Plaintiffs seek declaratory and permanent injunctive relief declaring the Rent Stabilization Law to be unconstitutional as applied to plaintiffs and their property, declaring that certain apartment leases are null and void, and permanently enjoining the defendants, and the City of New York (the "City") and the State of New York (the "State"), from enforcing the Rent Stabilization Law as to plaintiffs and their property, as well as the issuance of writs necessary or appropriate in aid of the jurisdiction of this Court.

## Parties

6.      James D. Harmon, Jr. and Jeanne Harmon (the "plaintiffs") are husband and wife. They are

2

also citizens of the United States who reside in their home at 32 West 76th Street, New York, New York (the "Building"). They are 64 and 63 years old, respectively. Plaintiffs own, and have owned, the Building jointly since January 13, 2005.

7.    Defendant Marvin Markus is a Member and Chair of the New York City Rent Guidelines Board (the "Rent Guidelines Board") and is its chief administrative officer.

8.    Defendant Deborah Van Amerongen is the Commissioner, Division of Housing & Community Renewal ("DHCR") of the State, and is responsible for the administration and enforcement of the Rent Stabilization Law.

**The Role of the New York City Council**

9.    The New York City Council (the "City Council") is vested with the legislative power of the City and has the power to adopt local laws and resolutions which it deems appropriate, and which are not inconsistent with the Constitution or laws of the United States.

10.    State law has enabled, and continues to enable, the City Council to declare an emergency for any or all housing accommodations, if the vacancy rate is not in excess of five percent (5%), and also enables the City Council to declare the end to a housing emergency once the vacancy rate exceeds five percent (5%).

11.    On March 29, 2006, the City Council enacted Local Law 3 which found that "a serious public emergency continues to exist in the housing of a considerable number of persons" within the City, and that the rent stabilization provisions of the Administrative Code should continue until April 1, 2009. Local Law 3 thereby subjected apartments #2R, #3F and #4F in plaintiffs' Building to continued rent regulation, when it was signed into law by the Mayor of the City on March 29, 2006.

12.     Upon information and belief, neither the Rent Stabilization Law, nor any related legislation enacted by the State or the City, define the term "vacancy rate" for purposes of the Rent Stabilization Law.

**The Role of the New York City Rent Guidelines Board**

13.     The Rent Stabilization Law requires the Rent Guidelines Board annually to establish allowable rent adjustments for lease renewals for rent stabilized apartments, considering, among other things:

   a.     the economic condition of the residential real estate industry in the affected area including such factors as the prevailing and projected

        i.      real estate taxes, and sewer and water rates,

        ii.     gross operating maintenance costs (including insurance rates, governmental fees, cost of fuel and labor costs),

        iii.    costs and availability of financing (including effective rates of interest),

        iv.     over-all supply of housing accommodations and over-all vacancy rates,

   b.     relevant data from the current and projected cost of living indices for the affected area, and

   c.     such other data as may be made available to it.

14.     The Rent Guidelines Board had and has no power or authority to:

   a.     consider how factors pertaining to the economic condition of the residential real estate industry affect plaintiffs' Building in particular; or

   b.     permanently exempt plaintiffs' Building from the Rent Stabilization Law; or

   c.     establish a particularized rent adjustment specifically for plaintiffs' Building, taking

4

into account the Building's economics, including the market rent for apartments #2R,

#3F and #4F.

## The Role of the New York State Division of Housing & Community Renewal "DHCR"

15.    DHCR is responsible for the supervision, maintenance and development of affordable low-

and moderate-income housing in the State, and is also responsible for the administration and

enforcement of the Rent Stabilization Code.

16.    DHCR has no power or authority to:

    a.    permanently exempt plaintiffs' Building from the Rent Stabilization Law; or

    b.    provide plaintiffs with just compensation for the taking of their property.

## STATEMENT OF FACTS

### The Harmon Family Building

17.    Plaintiffs own the five story brownstone Building subject to a $1.5 million mortgage held by

a financial institution.  Constructed in 1891 and situated on lot 51, block 1128 in New York

County (Manhattan), the Building is located in the Upper West Side/Central Park West

Historic District, so designated by the New York City Landmarks Preservation Commission.

18.    The Rent Stabilization Law renders the Building and its apartments subject to rent regulation,

as a multiple dwelling of six or more units built before 1974.

19.    The City's 2005 New York City Housing and Vacancy Survey found that, in 2005,  the City

had a total of 2,092,363 rental units of which 1,043,677 were subject to rent stabilization

regulation.

20.    As of 2005, only 4.6% of the total number of rent stabilized apartment units Citywide were

located in buildings built before 1900.

21.   The Harmon family has owned the Building since 1949, i.e., twenty (20) years before the Building was made subject to rent stabilization in 1969.

22.   Sylvie and Louis Bebert, the immigrant grandparents of plaintiff James Harmon, purchased the Building by deed dated August 17, 1949. Ownership then passed to their daughter, i.e., plaintiff James Harmon's mother, by deed dated May 13, 1953.

23.   At various times since 1953, three (3) generations of the Harmon family have resided in the Building as their home.

24.   For thirty-nine (39) years without interruption, the Building has been subject to rent regulation by the Rent Stabilization Law since its enactment, while in the continuous ownership of plaintiffs, the Harmon family and their ancestors.

25.   At all times relevant to this complaint, the defendants and the City and the State knew that plaintiffs owned the Building, knew plaintiffs' address and knew that certain apartments in the Building were subject to rent regulation by the Rent Stabilization Law.

**The Rent Stabilized Apartments**

26.   Plaintiffs have resided in the Building since April 2002. They now reside on the first floor of the Building.

27.   The three floors above plaintiffs' residence contain two (2) one-bedroom apartments on each floor for a total of six (6) apartments on those floors. Three (3) of those apartments, i.e., #2R, #3F and #4F are subject to rent regulation by the Rent Stabilization Law. The three other apartments, i.e., #2F, #3R and #4F, are market rate rentals.

28.   As a result of the Rent Stabilization Law, the Harmon family has subsidized the rent for apartments #2R, #3F and #4F for a total of eighty-eight (88) tenant-years for the benefit of

the current tenants of those apartments.

29.     The combined regulated average monthly rent for the Building's three rent stabilized one (1) bedroom apartments, i.e., #2R, #3F and #4F, is fifty-nine percent (59%) lower than the average monthly rent for the three unregulated, market rate one (1) bedroom apartments in the Building.

30.     Upon information and belief, Tenant 3F residing in apartment 3F is 63 years old.  Tenant 3F has resided in apartment #3F since 1977 under a lease dated December 12, 1976, which then called for a monthly rent of $325 per month.  The current regulated rent for apartment #3F is $951.22.

31.     The Rent Stabilization Law has regulated the rent and other conditions of occupancy of apartment #3F for the thirty-one (31) year duration of Tenant 3F's occupancy. The current lease, executed by plaintiffs without their consent because of the legal coercion of the Rent Stabilization Law, covers the period February 1, 2007 - January 31, 2009.

32.     Upon information and belief, Tenant 3F currently owns a private home located in the Hamptons area of Long Island which she purchased for $320,000 in 2001, and which is now held subject to a mortgage from Citibank in the amount of $190,000. Upon information and belief, Tenant 3F's monthly mortgage payment for her private home on Long Island is approximately $1500.

33.     Tenant 3F paid the regulated rent for March 2008 with a check dated February 22, 2008.

34.     Upon information and belief, Tenant 3F is a senior vice president of a New York based executive search firm. Upon information and belief, Tenant 3F specializes in conducting searches for senior executives in a range of industries, with a special focus on law and

professional services firms. Her functional expertise reportedly lies in the areas of finance/controllership, human resources, marketing, general administrative and in-house legal roles.

35.     Upon information and belief, Tenant 2R is seventy (70) years old. Tenant 2R has resided in apartment #2R since 1976 under a lease dated February 1, 1976, which then called for a monthly rent of $425. The current regulated rent for apartment #2R is $1298.24.

36.     The Rent Stabilization Law has regulated the rent and other conditions of occupancy of apartment 2R for the thirty-two (32) year duration of Tenant 2R's occupancy. The current lease, executed by plaintiffs without their consent because of the legal coercion of the Rent Stabilization Law, covers the period February 1, 2007 - January 31, 2009.

37.     Tenant 2R paid the regulated rent for March 2008 with a check dated March 5, 2008.

38.     On June 26, 2006, the Rent Guidelines Board established the lawful rent for apartments #2R and #3F in plaintiffs' Building, the leases for which were renewed in 2007 without plaintiffs' consent and due to the legal coercion of the Rent Stabilization Law.

39.     Tenant 4F has resided in apartment #4F since 1982 under a lease dated November 2, 1982, which then called for a monthly rent of $400. The current regulated rent for apartment #4F is $908.72.

40.     The Rent Stabilization Law has regulated the rent and other conditions of occupancy of apartment #4F for the twenty-five (25) year duration of Tenant 4F's occupancy. The current lease, executed by plaintiffs without their consent because of the legal coercion of the Rent Stabilization Law, covers the period December 7, 2007 - December 6, 2008.

41.     Upon information and belief, Tenant 4F is a senior vice president/creative director for a New

8

Jersey health care product brand-building advertising agency employing 410 employees with reported annual revenues of $51.7 million.

42. Tenant 4F paid the regulated rent for March 2008 with a check dated March 1, 2008.

43. On June 26, 2007, the Rent Guidelines Board established the lawful rent for apartment #4F, the lease for which must be renewed in 2008 without plaintiffs' consent and due to the legal coercion of the Rent Stabilization Law.

## The Rent Stabilization Law

44. The Rent Stabilization Law regulates allowable rents in apartments #2R, #3F and #4F in the Building, compels plaintiffs to lease those apartments to the tenants occupying them and to their successors in perpetuity on terms dictated by law, and denies plaintiffs the right to exclude the tenants of those apartments and their successors from the Building, thereby requiring plaintiffs to remain in the residential real estate business for life without their consent.

45. Since its original enactment in 1969, and at all times since, new residential construction has been exempt, is exempt, and will continue to be, exempt from regulation by the Rent Stabilization Law.

46. In an affidavit dated July 18, 1969, the Administrator of the City's Housing and Development Administration stated that the purpose of exempting new residential construction from rent regulation by the Rent Stabilization Law was "as a means of encouraging future construction of housing accommodations by allaying the fears of builders concerned about possible further extention (sic) of rent control to new construction."

47. Since its original enactment in 1969, and at all times since, the City Council has declared that

9

the transition from regulation to a normal market of free bargaining between landlord and tenant is the objective of City policy.

48.    The Rent Stabilization Law in combination with other statutes grants Tenants 2R, 3F and 4F rights and protections having attributes of fee ownership, including the following:

a.    A lifetime right to renew their leases with rent set and regulated by law, without the owner's consent and against his or her will;

b.    A lease renewal term of one or two years at the tenants' option, without the owner's consent and against his or her will;

c.    Only one of the plaintiffs may recover possession of apartments #2R, #3F and #4F solely for their personal use and occupancy as their primary residence, or that of their immediate family, limited to their daughters, mother, brothers, sisters, grandsons or granddaughters and son-in-law, as applied to plaintiffs, and no other persons and for no other purpose;

d.    Because Tenants 2R and 3F are over sixty-two (62) years old, plaintiffs may not recover occupancy, unless plaintiffs offer to provide and, if requested, provide those tenants with an equivalent or superior housing accommodation at the same or lower regulated rent in a closely proximate area to the Building;

e.    Tenants 2R, 3F and 4F have absolute, statutory succession rights for family members and other persons with whom they have emotional and financial commitment, and interdependence and who may have resided with them for two (2) years. Without plaintiffs' consent, such family members and others would succeed to the rights of the tenant of record upon the tenant's permanent departure or death;

10

f.  The right to sublease with the owner's consent which may not be unreasonably withheld;

g.  Leases for apartments #2R, #3F and #4F may not limit occupancy of those apartments to the tenant/lessee named in the lease;

h.  Tenants may collect rent from any occupant/roommate not named as a lessee in the lease;

i.  Plaintiffs cannot evict a tenant for having an excessive number of non-lessee roommates;

j.  No eviction is permitted except on grounds allowed by statute;

k.  Apartment #2R, #3F or #4F would be removed from rent regulation, if the legal regulated rent for a particular apartment was two thousand dollars ($2000) or more per month when, and if, the apartment was vacated by one of those tenants;

l.  If the total annual federal adjusted gross income of a tenant occupying #2R, #3F or #4F were in excess of one hundred seventy-five thousand dollars ($175,000) in each of the two (2) preceding calendar years, and the legal regulated rent for a particular apartment was two thousand dollars ($2000) or more per month, only then could the apartment occupied by that tenant be removed from rent regulation;

m.  In that case, plaintiffs would be required to offer the apartment to the high-income tenant at a rent not in excess of the market rent;

n.  Because tenants 2R and 3F are over sixty-two (62) years of age, the City could subsidize their rent by exempting them from rent increases, provided that the tenant's "aggregate disposable income" (not including gifts, inheritances, payments, certain

11

social security and private pension payments), did not exceed twenty five thousand dollars ($25,000), in exchange for which plaintiffs would receive a tax abatement, not a direct subsidy;

o.  Tenants 2R, 3F and 4F have the right to have plaintiffs perform or provide janitorial services on a twenty-four (24) hour basis, and to have their apartments painted every three (3) years; and

p.  Plaintiffs are required to register apartments ##2R, 3F and 4F and their rent with the State annually.

49. The Rent Stabilization Law requires plaintiffs to provide these and other services for life without plaintiffs' consent, and without regard to plaintiffs' financial and personal circumstances, physical health, family situation, age and pursuit of happiness.

50. The Rent Stabilization Law prohibits plaintiffs from withdrawing apartments #2R, #3F and #4F from the market with the intent to sell or rent the Building, or any part of it.

51. Upon vacancy by its rent stabilized tenant, apartments #2R, #3F and #4F would remain subject to rent stabilization.

52. Upon vacancy of #2R, #3F or #4F, plaintiffs would be required to execute a lease with a new, successor tenant with a regulated rent and term set by the Rent Stabilization Law.

53. The new, successor tenant would then acquire the status of a rent stabilized tenant with all of the legal rights and protections accorded that status.

54. The Rent Stabilization Law permits a rent increase for apartments #2R, #3F and #4F equal only to 1/40th or 1/60th of the pro rata total cost of a major capital improvement in the Building, excluding any finance charges.

12

55.   Waivers by tenants of their rent stabilization rights are contrary to public policy.

56.   The provisions of any lease inconsistent with the Rent Stabilization Law are void and unenforceable.

57.   The Rent Stabilization Law provides for enforcement through monetary penalties, treble damages through a private right of action and judicial injunctive relief.

**The Impact of the Rent Stabilization Law**

**a. Impact on the Plaintiffs**

58.   Through rent regulation by the Rent Stabilization Law, the City has permanently taken, and will continue to take, plaintiffs' property for a private use without just compensation, with succession rights granted to tenants in perpetuity, potentially beyond the lives of plaintiffs and the current tenants of apartments #2R, #3R and #4F.

59.   The Rent Stabilization Law permits Tenants 2R, 3F and 4F to physically and permanently occupy the Building without plaintiffs' consent and against their will.

60.   Neither the City nor the State has paid, nor will pay, plaintiffs any compensation for the taking of their property, including lost beneficial use, lost rent, leasehold encumbrances on title and reduced property value, nor does the Rent Stabilization Law provide any authority and process through which just compensation may be sought and paid.

61.   The Rent Stabilization Law has also forced, and will continue to force, plaintiffs to work and provide services for life for the tenants of apartments #2R, #3F and 4F# without plaintiffs' consent and by the threat of coercion through law and the legal process.

62.   The Rent Stabilization Law substantially impairs and abrogates plaintiffs' right to contract: a) to enter into leases with tenants, including Tenants 2R, 3F and 4F and their successors in

13

interest, on price, duration and other terms as might be agreed upon between plaintiffs and those tenants, and b) to contract for the sale of, and to sell, the Building, free of any statutory leasehold interests in apartments #2R, #3F and #4F.

63. The Rent Stabilization Law prevents plaintiffs from bequeathing the Building to the next generation of the Harmon family, free of any statutory leasehold interests in apartments #2R, #3F and #4F.

64. The Rent Stabilization Law compels and forces plaintiffs to use the Building as a multiple dwelling.

65. The Rent Stabilization Law has denied, and will continue to deny, plaintiffs' right to equal protection of the law, among other ways, by:

    a.    Without a rational basis, compelling plaintiffs (without regard to their ages) to provide Tenants 2R and 3F (because of their ages) with an equivalent or superior housing accommodation at the same or lower regulated rent in a closely proximate area to the Building, as a condition precedent to plaintiffs' recovery of possession of those apartments for plaintiffs' own use;

    b.    Without a rational basis, subjecting plaintiffs' Building to the Rent Stabilization Law, while exempting new construction from rent regulation, thereby shifting the burden of rent stabilization to the owners of existing buildings;

    c.    Without a rational basis, compelling plaintiffs to rent apartments #2R, #3F and #4F at a regulated rent to tenants having an adjusted gross income of up to $175,000 without due regard for the plaintiffs' financial circumstances; and

    d.    Substantially interfering with plaintiffs' fundamental rights:

    i.      to use and enjoy their home and property;

    ii.     to the pursuit of happiness; and

    iii.    to be free from arbitrary legal discrimination on account of their ages, tenant incomes and the status of the Building as existing construction.

**b. Impact on the Market**

66.    Upon information and belief, as reported by the Rent Guidelines Board, during the period 1960 - 2005, the average annual net rental vacancy rate (as that term was understood by the Rent Guidelines Board) for the City overall was 2.70% as follows:

| Year | Vacancy Rate | | Year | Vacancy Rate |
|------|------|---|------|------|
| 2005 | 3.09% | | 1981 | 2.13% |
| 2002 | 2.94% | | 1978 | 2.95% |
| 1999 | 3.19% | | 1975 | 2.77% |
| 1996 | 4.01% | | 1970 | 1.50% |
| 1993 | 3.44% | | 1968 | 1.23% |
| 1991 | 3.78% | | 1965 | 3.19% |
| 1987 | 2.46% | | 1960 | 1.81% |
| 1984 | 2.04% | | | |

67.    On March 10, 1969, the Rent Guidelines Board issued a report stating that, in the Spring of 1968, there were 2,096,058 renter-occupied housing units in the City.

68.    The 2005 New York City Housing and Vacancy Survey (the "2005 NYC Housing Vacancy Survey") reported that, during the period February-March 2005, there were 2,092,363 rental units in the City.

15

69.     The U.S. Census Bureau has reported that the City's population was 7,894,862 in 1970, 8,008,278 million in 2000 and 8,214,426 in 2006.

70.     Upon information and belief, the staff of the Rent Guidelines Board compiled data which established that the number of new dwellings completed annually Citywide did not increase during the period 1969-2004, i.e., years in which the Rent Stabilization Law has been in effect, notwithstanding exemptions from rent regulation for new construction.

71.     The Rent Guidelines Board report, <u>Housing NYC: Rents, Markets and Trends 2007,</u> `reported that, as of 2006, 87,358 (8.6%) of the residents of the City's 1,015,655 apartments under rent stabilization had household incomes of $100,000 or more.

72.     The City's 2002 Housing New York City Housing Report found that Citywide median stabilized rents for pre-1947 buildings was twenty percent (20%) lower than non-regulated, market rents.

73.     The City's 2005 New York City Housing and Vacancy Survey found that Citywide median stabilized rents for pre-1947 buildings was nineteen percent (19%) lower than non-regulated, market rents.

74.     The Rent Guidelines Board found that, as of Spring 2005, in Manhattan, the median market-rate rent for a one (1) bedroom apartment was $2200, and $1400 for a rent stabilized one (1) bedroom apartment, i.e., the rent for rent stabilized apartments was $800 per month or thirty-six percent (36%) lower than the rent for market rate apartments.

## City Council Findings and Declaration of Emergency

75.     New York State law required, and continues to require, the City Council to do the following as conditions precedent to the enactment of the rent stabilization provisions of the

16

Administrative Code:

      a.      to adopt a resolution declaring the existence of a housing emergency; and

      b.      to conduct a public hearing on not less than ten days reasonable public notice.

76.    When it enacted the Rent Stabilization Law in 1969, the City Council made the following findings and declaration of emergency, which the City Council has since found to continue for the next thirty-nine (39) years, among other findings:

    a.    that a serious public emergency continues to exist in the housing of a considerable number of persons within the city of New York which emergency was created by war, the effects of war and the aftermath of hostilities;

    b.    that such emergency necessitated the intervention of federal, state and local government in order to prevent speculative, unwarranted and abnormal increases in rents;

    c.    that there continues to exist an acute shortage of dwellings;

    d.    that to prevent such perils to health, safety and welfare, preventive action by the Council continues to be imperative;

    e.    that such action is necessary in order to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare;

    f.    that the transition from regulation to a normal market of free bargaining between

17

landlord and tenant, while still the objective of state and city policy, must be administered with due regard for such emergency.

77.    According to the City Council, as of 1969, the "emergency was created by war, the effects of war and the aftermath of hostilities."

78.    Five years later, in 1974, the City Council amended the rent stabilization provisions of the Administrative Code and re-declared the emergency, but changed the rationale for it.

79.    The City Council did this by deleting the finding that the "emergency was created by war, the effects of war and the aftermath of hostilities," and substituting the finding that "many owners of housing accommodations in multiple dwellings, not subject to [rent regulation]...were demanding exorbitant and unconscionable rent increases as a result of the aforesaid emergency, which led to a continuing restriction of available housing...".

80.    Upon and information and belief,  beginning in 1969, and then in 1979, 1982, 1985, 1988, 1991, 1994, 1997, 2000, 2003 and 2006, the City Council declared that "a serious public emergency continues to exist in the housing of a considerable number of persons ...[and]...the transition from regulation to a normal market of free bargaining between landlord and tenant, while still the objective of state and city policy, must be administered with due regard for such emergency."

**2006 Declaration of Emergency and Extension of the Rent Stabilization Law**

81.    Upon information and belief, in February and March 2006, the exact dates as yet unknown, the City Council provided notice of a public hearing regarding extending the rent regulation provisions of the Administrative Code and "[d]etermining that a public emergency requiring rent control...continues to exist."

18

82.    Upon information and belief, this notice was published through the City Council's website http://council.nyc.gov/ , through notice to the press and through posting of a notice in City Hall.

83.    Upon information and belief, during the period January through March 2006, the City Council did not publish notice of the hearing in the City Record which is the official newspaper of the City.

84.    Upon information and belief, the City Council did not publish notice of the hearing in New York's major daily newspapers of general circulation and readership, i.e., The New York Times, The New York Daily News, The New York Post and Newsday.

85.    Upon information and belief, the notice did not state that the hearing concerned whether or not to declare a public housing emergency as a prerequisite for extending the rent stabilization provisions of the Administrative Code for three (3) more years.

86.    Upon information and belief, the notice did not state that plaintiffs, other property owners and other members of the public would be given the opportunity to be heard.

87.    The City Council did not provide, and plaintiffs did not receive, personal service of notice of a public hearing regarding the extension of the rent stabilization laws and a declaration of housing emergency, nor service by certified mail, return receipt requested, nor any other notice.

88.    The Council's notice by website and press release publication of a public hearing on a declaration of the existence of a housing emergency and extension of the rent stabilization laws was unreasonable and failed to provide plaintiffs with adequate notice, thereby denying them an opportunity to be heard.

19

89.     On March 3, 2006, the Committees on Housing and Buildings and State and Federal Legislation of the City Council (the "Council Committees") conducted a hearing regarding a declaration of the existence of a housing emergency and extension of the rent stabilization laws.

90.     At the hearing, the Council Committees received testimony from Shaun Donovan, the City's Commissioner of Housing Preservation and Development, that, as of June 2005:

        a.      the City had the largest housing stock in 40 years;

        b.      home ownership in the City was at all-time high;

        c.      the satisfaction of New Yorkers with their neighborhoods and overall building conditions was at an all time high;

        d.      a large number of affordable housing units were coming on to the market because of the Mayor's Housing Marketplace Plan and tax benefit programs;

        e.      the overall supply of housing had increased; and

        f.      the vacancy rate in Manhattan was 3.79%.

91.     Applying the undefined 5% vacancy rate figure as did Commissioner Donovan, the declared housing emergency would have been over in Manhattan in 2005 if there had been 1.21% more apartments available for rent in Manhattan, i.e., 6,819 apartments, from a market consisting of a total of 563,589 renter-occupied units in Manhattan.

92.     The Commissioner's testimony was based, in part, on the 2005 NYC Housing Survey to which the City Council and the Council Committees had access.

93.     The City's 2005 Housing Survey found that: "In 2005, housing and neighborhood conditions were extremely good."

20

94.     On March 22, 2006, the Council Committees passed a resolution determining that a public emergency requiring rent control in the City of New York continues to exist and will continue to exist.

95.     Thereafter, on March 29, 2006, the City Council enacted Local Law 3, which was then signed into law, extending the rent stabilization provisions of the Administrative Code until April 1, 2009.

96.     The legislation also reaffirmed and "repromulgated" the declaration of emergency and findings which were first declared in 1969, and which were then again restated ten (10) times in subsequent years over almost four (4) decades, including the following:

a.      that a serious public emergency continues to exist;

b.      that such emergency necessitated the intervention of federal, state and local government;

c.      that there continues to exist an acute shortage of dwellings;

d.      that New York State legislation enacted in 1971, removing controls on housing accommodations as they become vacant, resulted in sharp increases in rent levels in many instances;

e.      that existing and proposed cuts in federal assistance to housing programs threaten a virtual end to the creation of new housing;

f.      that regulated rents would prevent exactions of unjust, unreasonable and oppressive rents, and unspecified disruptive practices and abnormal conditions from creating an unstated serious threat to the public health, safety and general welfare;

g.      that recent studies establish that the acute housing shortage continues to exist;

21

h.     that there has been a further decline in private residential construction due to existing and proposed cuts in federal assistance to housing programs;

i.     that such conditions constitute a grave emergency.

## The City Council's Basis for the Declaration of Emergency and Rent Stabilization Extension

97.    The action of the City Council enacting Local Law 3 in 2006, which extended the rent stabilization provisions of the Administrative Code, was arbitrary and served no valid public purpose, among other reasons, because:

a.     The City Council relied on the undefined vacancy rate standard;

b.     The City Council's proffered justification was unsupported and contradicted by the facts before the Council;

c.     The City Council continued rent stabilization legislation known to have failed to accomplish its stated purpose;

d.     The City Council failed to consider whether the stabilization of the rent for apartments #2R, #3F and #4F would further the law's stated purpose; and

e.     During the approximate period January 1, 2005 to the present, the Rent Stabilization Law was, is and will continue to be the antithesis of "a normal market of free bargaining."

98.    The hearing record, the 2005 New York City Housing and Vacancy Survey and the testimony of City Housing Commissioner Shaun Donovan do not provide either a rational basis or reasonable foundation for the Council Committees' resolution, nor the City Council's 2006 findings and declaration of a grave housing emergency.

99.    The legislative extension of the Rent Stabilization Law was not reasonably related to the City

22

Council's proffered justification for its enactment. Since 1969, the City has repeatedly declared that the "objective" of rent stabilization is "the transition from regulation to a normal market of free bargaining between landlord and tenant." This has not occurred for plaintiffs' Building, nor the rental market as a whole. The City Council's March 22, 2006 declaration of a housing emergency, however unsubstantiated, admitted the failure of the Rent Stabilization Law to accomplish the stated objective of a return to a free rental market, almost four decades after its initial enactment.

100.    In 1969, the City Council first made the exact same findings regarding a serious public emergency, the intervention of federal, state and local government, serious threats to the public health, safety and general welfare and a grave emergency.

101.    In 1974, the City Council first made the exact same findings regarding sharp increases in rent levels and proposed cuts in federal assistance to housing programs.

102.    The City Council stated its basis for the 2006 declaration of housing emergency and extension of the Rent Stabilization Law as follows:

a.      a citywide rental vacancy rate of 3.09%;

b.      the vacancy rate in 2003 was 2.94%;

c.      approximately 65,000 vacant available rental units which was an increase of approximately 4,000 units since 2002;

d.      the number of housing units increased by approximately 52,000 units since 2002;

e.      the total number of rental units increased by 0.4% during the period 2002 -2005;

f.      the rental stock subject to rent stabilization did not change significantly during the period 2002 -2005; and

23

g. the median monthly gross rent increased by 5.4% (adjusted for inflation) during the period 2002 -2005.

103. Upon information and belief, no facts or information were before the City Council in the public record at the March 3, 2006 hearing, and when the City Council enacted Local Law 3 on March 29, 2006, regarding the intervention of federal and state government, sharp increases in rent levels, proposed cuts in federal assistance or the existence of a grave housing emergency.

**The 2006 and 2007 Regulated Rent Adjustments by the Rent Guidelines Board**

104. On June 19 and 22, 2006, and then again on June 12 and 19, 2007, the Rent Guidelines Board held public hearings, the purpose of which was to collect information relating to all factors enumerated in paragraph 13 of this complaint, in order to establish annual guidelines for rent adjustments for housing accommodations subject to rent stabilization.

105. These hearings were required by section 26–510(h) of the Administrative Code.

106. The Administrative Code required the Rent Guidelines Board to publish notice of the date, time, location and summary of subject matter for the public hearing or hearings in the City Record daily for a period of not less than eight days and at least once in one or more newspapers of general circulation at least eight days immediately preceding each hearing date, at the expense of the City.

107. Upon information and belief, the Rent Guidelines Board did not publish notice of the hearing in New York's major daily newspapers of general circulation and readership, i.e., The New York Times, The New York Daily News, The New York Post and Newsday.

108. Upon information and belief, in 2006 and 2007, the Rent Guidelines Board did not provide,

24

and plaintiffs did not receive, personal service of notice of the June 2006 and 2007 public hearings to establish allowable rent adjustments for lease renewals for the three rent stabilized apartments in their Building, nor did plaintiffs receive service of such notice by certified mail, return receipt requested.

109.    Upon information and belief, in 2006 and 2007, the Rent Guidelines Board published notice in the City Record of the June 19 and 22, 2006, and June 12 and 19, 2007 public hearings "to consider public comments concerning rent adjustments for renewal leases for apartments ...subject to the Rent Stabilization Law."

110.    The City Record notice did not state the criteria upon which the Rent Guidelines Board would make its decision, as enumerated in paragraph 13 of this Complaint.

111.    The published notices in the City Record were unreasonable and failed to provide plaintiffs with adequate notice, thereby denying them an opportunity to be heard.

112.    In 2006 and 2007, by order 2006 Apartment & Loft Order #38 dated June 27, 2006 and by order  2007 Apartment & Loft Order #39 dated June 26, 2007, the Rent Guidelines Board established the allowable rent for rent stabilized apartments #2R, #3F and #4F in plaintiffs' Building without plaintiffs' consent.

**The City and State's Alternatives to Targeted, Discriminatory Rent Regulation**

113.    As applied to plaintiffs, the Rent Stabilization Law was, is and will continue to be unfair, unreasonable, and unnecessarily broad given the taking of plaintiffs' property, impairment of their contract rights, involuntary servitude, plaintiffs' ages and other circumstances, and the less restrictive and less intrusive alternatives available to the City to accomplish the proffered purpose of the Rent Stabilization Law.

25

114.    The City had, is using, and will continue to have and use, alternatives to rent stabilization to accomplish the legitimate goals of public housing policy, such as, Section 8 and other government rent subsidies, as well as tax incentives, and the Mayor's New Housing Marketplace Plan funded by the City with $7.5 billion, including $6.1 billion since 2002, with the purpose of providing affordable housing.

115.    Upon information and belief, as of 1999, 6.5% of rent stabilized households received Section 8 subsidies.

116.    Upon information and belief, since 2002, the City has funded 83,000 affordable housing units, including 64,408 units funded under the New Housing Marketplace Plan, which is projected to provide165,000 affordable housing units by 2013.

117.    Upon information and belief, on April 10, 2008, the State announced a historic increase of $300 million in funding for the State's housing programs.

118.    After a thirty-nine (39) year experiment, plaintiffs should not be made to bear any longer the burden of a City and State rent stabilization policy, legislation and regulations which have not abated the alleged housing emergency, and which, in fairness, should be borne by the public as whole.

119.    The means (rent stabilization) did not produce the desired end (rental free market), nor does the proffered end justify the continued use of the failed means, where other less intrusive means are available to further legitimate housing policy goals.

**First Claim for Relief**
**(Taking Without Just Compensation -**
**Fifth Amendment - 42 U.S.C. § 1983)**

120.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3  through

114 above, as if fully set forth herein.

121.   The defendants have caused, and will continue to cause, plaintiffs to be deprived of their

right to possess, use and dispose of the Building, and have taken plaintiffs' property for a

claimed public use, whereas it is in fact a private use, without just compensation in violation

of the Takings Clause of the Fifth Amendment of the Constitution.

122.   In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be

subjected to this deprivation of rights guaranteed to them by the Constitution.

123.    By reason of the foregoing, plaintiffs are entitled to declaratory judgment against the

defendants.

**Second Claim for Relief**
**( Substantive Due Process -**
**Fourteenth Amendment - 42 U.S.C. § 1983)**

124.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3  through

114 above, as if fully set forth herein.

125.   The defendants have caused, and will continue to cause, plaintiffs to be deprived of their

property without due process of law in violation of the Due Process Clause of the Fourteenth

Amendment to the Constitution.

126.   In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be

subjected to this deprivation of rights guaranteed to them by the Constitution.

127.    By reason of the foregoing, plaintiffs are entitled to declaratory judgment against the

27

defendants.

### Third Claim for Relief
### (Procedural Due Process -
### Fourteenth Amendment - 42 U.S.C. § 1983)

128. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

129. The defendants have caused, and will continue to cause, plaintiffs to be deprived of their property without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution.

130. In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the Constitution.

131. By reason of the foregoing, plaintiffs are entitled to declaratory judgment against the defendants.

### Fourth Claim for Relief
### (Contract Clause -
### Article I - 42 U.S.C. § 1983)

132. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

133. The defendants have caused, and will continue to cause, plaintiffs to be deprived of their right to be free from any law impairing the obligation of contracts guaranteed by the Contract Clause of Article I § 10 of the Constitution.

134. In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the Constitution.

135. By reason of the foregoing, plaintiffs are entitled to declaratory judgment against the

defendants.

## Fifth Claim for Relief
### (Involuntary Servitude -
### Thirteenth Amendment - 42 U.S.C. § 1983)

136.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

137.    The defendants have caused, and will continue to cause, plaintiffs to be deprived of their right to be free from involuntary servitude guaranteed by the Thirteenth Amendment to the Constitution.

138.    In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the Constitution.

139.    By reason of the foregoing, plaintiffs are entitled to declaratory judgment against the defendants.

## Sixth Claim for Relief
### (Equal Protection Clause -
### Fourteenth Amendment - 42 U.S.C. § 1983)

140.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

141.    The defendants have caused, and will continue to cause, plaintiffs to be deprived of their right to equal protection of the law guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

142.    In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the Constitution.

143.    By reason of the foregoing, plaintiffs are entitled to declaratory judgment against the

29

defendants.

**Seventh Claim for Relief**
**(Permanent Injunctive Relief**
**- 42 U.S.C. § 1983 and the Court's Inherent Authority**
**to Issue Injunctions to Protect Constitutional Rights)**

144.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

145.    In the absence of injunctive relief, plaintiffs will continue to be irreparably harmed and to be subjected to the deprivation of rights guaranteed to them by the Contract Clause of the Constitution, and by the Fifth, Thirteenth and Fourteenth Amendments to the Constitution.

146.    By reason of the foregoing, plaintiffs are entitled to injunctive relief against the defendants.

147.    There has been no prior application for injunctive relief.

**Eighth Claim for Relief**
**(Necessary and Appropriate Writs -**
**28 U.S.C. § 1651)**

148.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

149.    By reason of the foregoing, plaintiffs are entitled to the issuance of writs necessary or appropriate in aid of the jurisdiction of this Court, and agreeable to the usages and principles of law.

**Ninth Claim for Relief**
**(Award of Attorney's Fees, Expert Fees and Costs**
**- 42 U.S.C. § 1988)**

150.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 3 through 114 above, as if fully set forth herein.

151.    Plaintiffs are entitled to award of costs, including reasonable attorney's fees and expert fees.

## Prayer for Relief

**WHEREFORE,** plaintiffs request judgment as follows:

A.    Declaring the Rent Stabilization Law unconstitutional as applied to plaintiffs and the Building because it violates the Takings Clause of the Fifth Amendment of the Constitution;

B.    Declaring the Rent Stabilization Law unconstitutional as applied to plaintiffs and the Building because it violates the Due Process Clause of the Fourteenth Amendment to the Constitution;

C.    Declaring the Rent Stabilization Law unconstitutional as applied to plaintiffs and the Building because it violates the Contract Clause of Article I of the Constitution;

D.    Declaring the Rent Stabilization Law unconstitutional as applied to plaintiffs and the Building because it deprives plaintiffs of their right to be free from involuntary servitude guaranteed by the Thirteenth Amendment to the Constitution;

E.    Declaring the Rent Stabilization Law unconstitutional as applied to plaintiffs because it violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution; and

F.    Declaring that the Building and apartments #2R, #3F and #4F are not subject to any regulation by the Rent Stabilization Law;

G.    Declaring that the leases for apartments #2R, #3F and #4F are null, void, unenforceable and of no legal effect;

H.    Directing the defendants, the City and the State to remove the Building and apartments #2R, #3F and #4F from registration as a rent stabilized building and apartments;

I.    Permanently enjoining the defendants, the City and the State from enforcing the Rent

Stabilization Law with respect to plaintiffs and with respect to the Building, including apartments #2R, #3F and #4F;

J.     Awarding plaintiffs reasonable attorneys fees, costs and expert fees; and

K.     Together with such other relief as this Court may deem just, equitable and proper.

Dated: New York, New York
        June 18, 2008

JAMES D. HARMON, JR.

By:

James D. Harmon, Jr. (JH 9965)
Attorney for Plaintiffs
32 West 76th Street
New York, New York 10023
(212) 595-1322

32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No.

JAMES D. HARMON, JR. ET AL.

Plaintiffs,

- against -

MARVIN MARKUS ET AL.

Defendants.

COMPLAINT

JAMES D. HARMON, JR.
Attorney for Plaintiffs
32 West 76th Street
New York, NY 10023
212-595-1322